AB MR. LANEY. Good morning, Your Honors. My name is Chris Laney. I, along with Dave Quinlan, represent Scientific Plastic Products. This case is a case from the board re-exam case in which the board found that the references Yamada, King, and Strassheimer rendered the claims invalid. Before I begin, I'd like to step back and try to clarify something that I don't know that I did so well in the briefs, and that's paint the forest. I think to paint the forest properly, I need to direct the court's attention to the fact that Yamada at A93 was filed in 94, that Strassheimer was filed in 91, and that the invention in this case was filed for in 2004. Why that's important is because there has been not one piece of evidence that suggests that there's been any technological, any development in that would have led someone skilled in the art to change Yamada, to motivate them to do something differently. Moreover, there's not one piece of evidence in the record that Yamada had experienced within that 10-year time frame any problems with leakage. And the reason that's important is because the very principle that the board relies upon and BIOTAGE relies upon is this notion that somehow leakage was the reason somebody would change Yamada to put on the seal of Strassenheimer. But if leakage was the problem, it existed in 1994. But the specification says leakage is the problem. But, Your Honor, that's where this thing goes astray. The specification does not say leakage was a problem. The specification, let me point out, this court says that in the statute, section 103, it says patentability shall not be negative by the manner in which the invention was made. And this court interpreted that to say the path that leads an inventor to the invention is expressly made irrelevant by patentability by statute. So what we have here is the inventor, when he was writing the specification, was faced with cartridges that were permanently shut when they were manufactured. And he speculated. He said, look, I think they're permanently- Are you suggesting, because I didn't hear an answer yet to Judge Newman, and I know I'm interrupting and probably preventing you from answering, but I guess I'm trying to But to the extent that the spec talks about leakage, this is the inventor's acknowledgment of a problem that he has, by his own ingenuity, come across? It says they leak at the seams. I mean, it's in there. Right. It says under pressure, there are leakages at the seams. But that is not with threaded connection. That's a general principle. Any gap that's under pressure and that has a fluid is going to leak. What I think is critical is he doesn't say known cartridges, such as Yamada, with threaded connections leak at the seams. He didn't know of them. He says they weren't used. He had no idea there were threaded connections used. And what's critical about that is the board, as well as Biotage's experts, say, wait a minute, Yamada existed, it had threaded connections, and it had no leakage problems. Are you saying he's not a person skilled in the art? I'm saying the law tells you you can't presume he's someone skilled in the art, and you can't take what he says as that knowledge of what someone skilled in the art knows. The law tells you that it doesn't matter what he believes because we're not looking at what he thinks, we're not looking at the path that led him to it. In fact, he was wrong in this case. He says threaded connections are not used. That is patently false. Yamada had threaded connections. It was used. The board says it was leak tight. I mean, it didn't have leakage. It says it was liquid tight. And Biotage argues that their expert didn't say that it wasn't leakage. That's a very nice use of the phrase, considering he said it in his patent. No, to be honored, he didn't say that. He didn't say Yamada had, he said threaded connections were not used. No, I mean patently false. But Biotage argues with the notion that their expert didn't get up and admit that Yamada didn't have any leakage problems. But if you look at his statement in context, it's on A501 of the record, paragraph 9, he begins the paragraph by saying, regarding significance of leak-proof cartridges, I'm not aware of any leakage problems with the Buchi column. But then he goes on to say, in addition, a company called NGK disclosed a patented column for flash chromatography that comprised threaded, detachable plastic cap and column and was suitable for pressures up to 100 PSI, and he cites Yamada. So they have an expert who says, person of skill in the art, the person we're supposed to be looking at, recognized that as early as 1994, those people knew we had columns that had threaded connections that didn't pose any leakage problems. And so it's from that perspective, then we go on and say, well, okay, so person of skill in the art didn't perceive any problems. In fact, Dr. Pearson goes on to say, in light of this prior art, the patents at issue in this case don't disclose anything unknown or unexpected with regard to claimed advantages. Once again saying, Yamada did everything this guy was trying to do. And so that's important because when we still look at the obvious in this analysis, and we look at what one skill in the art is doing, we know from standard oil that the person of skill in the art follows conventional wisdom. In other words, if it ain't broke, he ain't going to fix it. The thing about patent is designed to promote innovation, not stagnation. The person of skill in the art is stagnant. He does what's available. He does what's known. It's just like you come out to the court today and you have a desk to put all your books, but you didn't sit in the back and say, gosh, I got a problem. Where am I going to put my books? And what the board did here is they said, well, because you had a desk out there, there was, you should have, one skill in the art knew there was a problem about where you were going to put your books. But there wasn't any perceived problem because you have a place to put your books. It's the same thing here. The person of skill in the art looking in the market didn't say, hey, there's a problem because Yamada disclosed the solution. Moreover, if you look at the board's analysis, it's clear that it's fraught with... Was there any problem with leakage in the prior art prior to Yamada disclosure? Your Honor, no evidence whatsoever. In fact, there's no evidence of declaration. This is an inter parte. Dr. Pearson, the biotages expert, didn't provide any. The board didn't cite to any. And in fact, what's telling, if you look at the board... Can you go back to Judge Newman's question, though, because I don't know how I'm supposed to interpret the patent's own reference to leakage in two places then. Am I not to interpret that as an acknowledgement that there exists a known leakage problem with these kinds of cartridges? Yes, Your Honor. I'm not supposed to interpret it that way? Well, how am I supposed to interpret it then? You're supposed to interpret it as the subjective understanding, the path that led the inventor to this solution. And what his problem was is there were these cartridges that were welded shut. These cartridges were manufactured so you couldn't detach the tops. And so he saw a problem with that. He speculated the reason, the only reason he had cartridges that were sealed shut during manufacture is because he perceived there may be leakage problems. But that's what the inventor believed, and this court's case law expressly says you can't look at what the inventor tells you, he thinks. You have to look at what those skilled in the art knew at the time. And what Yamada establishes, both by the board's finding as well as Biotage's own experts' concessions, is that those skilled in the art recognized that threaded connections didn't have a leakage problem. But you have prior art using an O-ring, which is well known to provide resistance against pressure or leakage of fluid or air. Absolutely, Your Honor. And that's the conventional wisdom. That's how the column would be designed. And so they didn't perceive of a problem, they didn't see any reason to innovate, to go beyond that. But it was designed because of leakage. Otherwise, why would you bother? It was designed because in this application, there cannot be leakage. And that was the solution to ensure there was no leakage. What has to exist is there has to be a reason why somebody would change that solution. There's simply no reason why someone skilled in the art who has the solution that keeps it from leaking, why are they then going to say, well, okay, I'm going to change it? Cost savings, gaskets are expensive. No evidence of any such thing. Sure there is. But there's expert testimony that says it would be cost saving. There's no evidence of testimony saying that the patented design is cheaper than Yamada. There's evidence that's saying the patented design is cheaper than a welded shut design, but nothing that says it's cheaper than Yamada. And I do believe, you don't even get there, because I don't believe you... What about the evidence in the other two cited references, King and I don't remember what where they say gaskets deteriorate and break down over time. Your Honor, I'm glad you brought that up, because I think that's an important part as well as why they erred as a matter of law. They went into a different field and found a problem that existed in a different field, and there's no evidence that those same issues existed in the field of the invention. And I think there's a reason for that. If you turn to the record to, and this is again their expert, their mechanical engineer, and she describes, it's A470 to A471. They say this is what soda pop bottles are subjected to. Closure must maintain this seal for long periods of time while the product is packaged and transported to stores. Flash chromatography, no such problem. It's not a storage device. You don't package a liquid. In fact, the very purpose of this is to prevent you from packaging the liquid. So you don't have that same issue. You're not storing it for long periods of time, so you don't have this issue with prolonged use that may exist in the soda pop bottle, but there's no evidence of that issue, that market pressure exists in flash chromatography. Then it goes on to say these seals for soda pop bottles must sit in the inventory or on shelves. Again, that's not an issue with flash chromatography cartridges. Then purchased by consumers, potentially open and reopen many times. I think common sense tells you soda pop bottles, the people that are going to be using them, use them haphazardly, don't care. They open and shut. It's used by kids, adults. They're thrown around. They're not cared for the way in the flash chromatography you have scientists conducting important expensive tests. They're naturally going to handle these things with much more care than, say, somebody with a soda pop bottle. Once again, evidencing that the issues that the board cites from a different field cannot be properly attributed to this field. Your Honor, I see I'm going into my rebuttal time. I'd like to reserve it if there's any other questions. All right. Yes, let's hear from the other side, Mr. Laney. Mr. Beck? Morning, Your Honors. May it please the Court? George Beck for Biotas. There's substantial evidence of a leakage problem that is the focus of the Ellis patent. As Your Honors were pointing to in the background, our view and the board's view was that that was an acknowledgment as to the state of the art. It wasn't a discussion of what Mr. Ellis invented. It wasn't characterized as that. And that was the board's determination, and I think it's incumbent on SPP to explain why that's a clear error, and I don't think they've done that. Why should it be interpreted as an acknowledgment in the prior art of a leakage problem? In fact, if anything, it's sort of pushing away from Yamada when it's talking about leakage by the threaded connections are not used in the body sort of thing. Most of the time when you have statements like this, they are discussing particular problems in prior art versions or other things, and none of that appears here. Your Honor, I'll grant it's not a model of clarity, but it's certainly talking about the potential of using threaded fasteners. Well, no, it says they aren't used. Well, it says there is such a thing as threaded fasteners, and it's not used in the field, according to Mr. Ellis. As to that point, he was wrong. The fact that threaded fasteners for LPLC existed is true. We know that from Yamada. Well, let's accept that a person of ordinary skill would understand that you're concerned about leakage when you have something up to 100 PSI. Why does that make it obvious to take these particular solutions and put them together? Well, there's a couple answers to that, Your Honor. First, as the Board pointed to, they identified in King and Strassheimer a concern with a gasket or a seal or a liner that might be used in a cap deteriorating or being damaged from over-tightening. Now, I think SPP is focused on deterioration and trying to tie that into storage. I'd note that there's no evidence that an LPLC cartridge would not be stored. But more to what the Board pointed to, the over-tightening problem, the same threaded connection, just common knowledge that if you over-tighten a threaded fastener, you can damage the seal. And that, I think, is a fair reading of King and Strassheimer, and that's why the Board referred to that portion of those references. So does your position depend on determining that these are an analogous art? And if we don't think so, your argument collapses? Your Honor, I think that it's clear under Graham that we have to rely on, identify the scope and content of the prior art. And I think it's clear that King and Strassheimer are analogous art. I'll focus on that and then come back to the additional evidence as to King and Strassheimer if I can. With respect to analogous art, the test is clear. You're supposed to identify the problem being addressed by the invention. We know the test. You're saying that the test is satisfied, and therefore, that's the end of it. And my question for you is, if for some reason we think that the test is not satisfied, can you prevail? Well, Your Honor, the rejection, as you know, is based on Yamada in view of those two references. I think that would undermine the Board's decision. I do think that Yamada alone, based on common sense and knowledge of how a threaded fastener works, is sufficient to render those claims obvious. We can't do that. Yeah, that's not what the Board said. The only rejections that are at issue here is Yamada in view of King and Strassheimer. But I do think the answer there is they're clearly analogous art. SPP has a problem here because SPP is faulting the Board for the way the problem is being defined. But that problem was defined by SPP. That's what they told the Board in their own brief, and the Board clearly referred to that portion of their brief. They said that the problem is being able to access a cartridge, and that's achieved by having a threaded fastener that's resealable. And secondly, that the cartridge has to operate under LPLC pressures. And both of those objectives are clearly addressed by King and Strassheimer. And in fact, King and Strassheimer, you know, SPP is taking an inconsistent position. They're suggesting that somehow LPLC is just too complicated and someone working that field wouldn't look to soda cap bottles. But in fact, the evidence is that they're designed at higher tolerances, that they can withstand higher pressure. And I think there's clear evidence, substantial evidence, that it was warranted to look to those references. Turning back to, you know, I think the fundamental question is why would one modify Yamada? And I've already spoken to what the Board pointed to. I think Judge Moore alluded to other evidence that's provided in Strassheimer and King themselves. And I'd refer first to Strassheimer. It says an object is to provide a plastic closure which is not based on complex design features. That's at JA-202. King then says that manufacture and insertion of a liner into a closure cap are relatively costly additional process steps. That's at A-180. And then King also says that the cap could be made by injection molding. So I think a person of ordinary skill in the art looking at that discussion would readily understand that having an additional element such as an O-ring leads to extra cost. And there's a benefit by replacing that O-ring or adding in a part, the seal, which is all the seal is is just an inclined surface that opposes the surface of the container itself. And so once you add that in, that opposing surface of the King and Strassheimer reference, that part can be injection molded and it can be formed together with the rest of the cap. So that saves cost and I think that's about the clearest marketing incentive one could expect. So for those reasons, I just don't see that SPP is able to identify any problems with the board's analysis. And I'd submit that even absent how the background of the invention is interpreted, we feel that it's a clear acknowledgment of a leakage problem specific to LPLC. Who is one of skill in the art in this case? There's been some debate about that. Our position has been that it's a person with a mechanical engineering background or industrial design background and that's based on the fact that the features of the invention are directed to mechanical closure features. SPP has stated that it would be a chemist who is completely ignorant of mechanical engineering. And I think they say in the reply that that's a settled issue, that we agree with that. We don't. Why would a chemist know to look in this bottle cap art to tighten up the chromatography? Well, I think first if it's someone with a chemical background that works in this field, they're still being tasked with designing this type of structure. So they would naturally look to similar structures with similar materials operating under similar pressures. And that would be something a chemist would be aware of. Well, you can certainly find it with perfect hindsight, but why would one looking forward, let's say that your tube is leaking, know to look in this area? Well, I think it's the same reasons we've discussed, Your Honor. Whether it's a chemist or a mechanical engineer, if they have a design, a market incentive to reduce the cost of an extra part, an O-ring, they would look for structures that still would operate under LPLC conditions, provide the same seal, and I think the bottle cap art would be something very familiar to virtually anybody. SPP says, in a way, they're implying that the soda bottle cap art is sort of more commonplace and pedestrian, and a chemist wouldn't look to it. I just don't think we can say that a chemist wouldn't know about a soda bottle cap. Mr. Beck, I'm going to ask Mr. Laney, so I want you to preempt him. You said that he takes the position that you've conceded that the person skilled in the art is a chemist, and you say you haven't conceded that. Tell me how you're going to rebut his statement when I ask him about it. It's simply just reference to the record, Your Honor. I think at our brief, at page 10, we cited the first East Oil Declaration at page 465, paragraphs 5 and 6. I think they've been relying on the Pearson Declaration, and in fact, what Mr. Pearson said, there's some aspects of the invention that relate to chromatography. Frankly, they're few and far between, but he said as to those aspects, the person would have some understanding of LPLC, but he then goes on in the remainder of his declaration, which is not cited by SPP, at paragraph 20. Where are you? I'm sorry. Let me just confirm this slide. I just have notes. I think it's A505. Can I ask really quickly, it seems to me from the blue brief that they clearly argue one of skilled in the art is a chemist, and that that's the vantage point from which this entire obvious misanalysis has to be made. I just don't remember. Did you expressly dispute in your red brief that a chemist is the vantage point? We did dispute that, Your Honor. At page 10 of our brief, I think we stated that the person of ordinary skill in the art would have a mechanical engineering or industrial design degree, and I think we had subsequent discussion of that point in reference to what they've been characterizing as an admission by Dr. Pearson. I thought only chemists built chromatography. Collins, you're saying that this chemist finding that at 100 PSI, there was some kind of leakage was required to go down the hall or across the street or whatever and find a mechanical engineer to solve the problem? That's correct. And what you're saying is your affidavit says a company seeking to design and manufacture would employ a person skilled in the art as a mechanical engineer? That's right, Your Honor. This point was disputed before the board, and we presented evidence that not only would they do it, but as to at least biotize. Mr. Easel, that's his job. I guess the problem is I just didn't see, and I must have missed it, or hopefully you'll point me to it, where the board actually resolved this dispute. If the entire vantage point is mechanical engineer versus chemist, that is really going to change the art that I think either of them would look to, in my view. And I just didn't see where the board adopted the mechanical engineer or the chemist. I just don't see that it actually resolved it. Did it? Your Honor, you didn't miss it. They didn't specifically address it. And what I would submit is looking at who is the person of ordinary skill in the art is a mirror image of saying what's analogous art. What would they look to? And the same considerations come into place. And here we have mechanical features that do a mechanical function of sealing. What was the inventor's background? I don't remember that either. Is he a chemist or a mechanical engineer? I think Mr. Ellis, and I'm sure SPP will know more about it than I, but I think Mr. Ellis is a chemist that does LPLC, but the joint inventor has an industrial design background. I think there was some declaration testimony to that fact. But what I would submit is that the board did address this issue in the sense that they didn't find it necessary. This was presented to the board and the board said, we think the person of ordinary skill in the art would look to Ken Strossheimer. I think implicit in that decision, they had to agree with Biotage that it wouldn't be a chemist completely ignorant of mechanical design structures such as Ken Strossheimer. Or that chemists aren't completely ignorant. Well, that's a good point, Your Honor. The idea that the bottle caps are known to children and the elderly and everybody in between is what SPP says. So your argument is, under the facts of this case, you don't think it would matter, but I imagine that you acknowledge that in some cases the definition of who is the skilled artisan could very much affect the scope of the analogous art. I agree with that, Your Honor. I think that's clear, but not in this case. But you're not saying, because this particular inventor may have been ingenious and come up with a nice simple solution to a problem he was confronted with, that that makes it obvious? That's right, Your Honor. I don't think that the particular level of skill of the inventors is the deciding factor. I mean, it's evidence we can look at, but I don't know if Mr. Ellis is very familiar with design criteria. Okay. Thank you, Mr. Beck. Thank you, Your Honor. Mr. Laley? I'm just going to address your question. I don't believe SPP ever said they conceded the point he says. What we said was that they conceded that the field of the invention is flash chromatography. And obviously, a person of skill in the art, if the art is flash chromatography, we look to that field. And what we said is Dr. Pearson conceded that people in the field of flash chromatography are chemists with experience with performing flash chromatography. What we dispute is that they try to make this amorphous thing saying, well, the field is flash chromatography, but the person of skill in the art is going to be a designer of flash chromatography. Which somehow that would change it to something else. But it's not. A person of ordinary skill in the field, by definition, has to be that ordinary person practicing in that field. And these claims, their method claims, are specifically for chromatography process. These claims are very narrow, specifically for cartridges used in the flash chromatography process. So this is not a case, like many of the cases they cite, where the claims are generic or broad. It doesn't claim a container. It doesn't claim a seal. It is very specific and narrow to a flash chromatography cartridge. I'd also like to point out specifically... I don't know. I'm a person of ordinary skill in the infantry art, but I don't know that I'd want to design a rifle cartridge. But I could. Well, I don't know the experience. I can't respond to that. I have no idea. I'm not an infantryman. But I'd just like to point out how clear it is that they used hindsight in this case. And I think it's clear in that record, A15, and they did it in all their opinions, the board did. And that's what we have to look at. What did the board say? The board never said there was a factual find. The board always said that we're relying on the teaching of the inventor for the leakage. For example, the known problem of leakage in threaded connections of plastic flash chromatography cartridges under pressure identified by the patent, not by their expert, not by references in the field, not by anything, but just the teachings of the inventors, what they rely upon. They say based on that, one of ordinary skill in the art would have turned to King and Strauss-Iver to improve Yamada. Once again, they're not relying on what people of ordinary skill knew, the information they knew. They're relying on the information the inventor brought to the table and taught in his application. And this becomes even more clear on the last paragraph, and I could indulge me. It says, we are not persuaded that the patent disclosure that threaded connections are not used to form the body of flash chromatography cartridges teach away from the prior art combination applied by the examiner. Now, before I go to the next sentence, I want to point out that the board made a factual finding that a person of skill in the art reading the statement and the specification would have interpreted the patentee's statement as saying that cartridges with threaded connections are prone to leakage. So they themselves made a factual finding saying, look, someone of skill in the art reading the patentee's teaching would come away believing that threaded connections are prone to leakage. Well, even after making that finding, they go on and they say, Yamada itself evidences that threaded connections were indeed used to form flash chromatography cartridges. Thus, rather than teaching away from the combination, the patentee's teachings would have led one of ordinary skill in the art to improve threaded connections disclosed in Yamada. That's absurd. It's absurd under this court's case law that says teaching away is teaching that would dissuade you from taking a particular direction. I don't understand. The board found the known problem of leakage in threaded connections of plastic LPLC cartridges under pressure identified in the 061 patent provides a reason for those of skill in the art to have turned to King and Strassmayer to improve the sealing arrangement set forth in Yamada. So there is an express fact finding by the board that the 061 patent is disclosing a known problem of leakage in threaded connections. And that's the error of law that they made. It's not an error of law. It's a fact finding. No, it's an error of law because what they've done is they've taken the... Wow. No. Okay. Go ahead. Continue to be aggressive. Go ahead. That helps you. The statute says you can't use the teachings of the patentee. Well, that is precisely what they've done here. They've taken the teachings of the patentee... No, they don't say the patentee taught that leakage in threaded connections. They make a fact finding that the 061 patent is disclosing a known problem of leakage. And above it they tell you how they got that known problem. They say that known problem is because the patentee said threaded connections are not used. If you read it in context of the paragraph above, they say that known problem is because the patentee said threaded connections are not used. And what I'm saying is the statute says you can't use the patentee's teachings to establish what those skill in the art know. You have to rely on other references, other information. And there simply is devoid of any reference. And it's inter parte. They could have submitted a declaration if in fact it were true that there were known problems with leakage.  Okay. Thank you. Thank you both. The case is taken under submission.